06-5536-cr
USA v. Kelley

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

—————————————

August Term, 2007

(Argued: May 12, 2008)                                                    Decided: January 5, 2009)

Docket No. 06-5536-cr

—————————————

United States of America,
                                                                   *Appellee*,


-*v.*-


Kevin O. Kelley,
                                                                   *Defendant-Appellant*,

—————————————

BEFORE:        FEINBERG, MINER, and HALL, *Circuit Judges*.

—————————————

        Appeal from a judgment of conviction entered December 4, 2006, in the United States District Court for the Southern District of New York (Wood, *C.J.*).  Kelley was convicted of four counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; and three counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2.  In this opinion, we address whether the district court erred in admitting evidence of the bogus account statements sent by the defendant to the victims on the grounds that such evidence is impermissible in the context of the charged securities violations when the account statements were sent after the purchases of the securities and were not made in connection with the purchase or sale of securities.  We hold that although the use of bogus account statements to lull defrauded investors is not in and of itself sufficient to establish a securities law violation, the use of such statements is relevant as evidence to prove, *inter alia*, the defendant's intent to defraud and the extent of the scheme employed.  Accordingly, for the reasons stated herein, and in an accompanying summary order, we affirm the district court's judgment of conviction.

—————————————

FOR DEFENDANT-APPELLANT:                    RICHARD B. LIND, Law Office of Richard B.
                                                                   Lind, New York, NY.

FOR APPELLEE:                                      STEVEN FELDMAN, (Daniel A. Braun, *on the brief*), Assistant United States Attorneys, *for* Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY.

PER CURIAM:

Defendant-appellant Kevin O. Kelley appeals from a judgment of conviction and sentence entered on December 4, 2006, in the Southern District of New York (Woods, *C.J.*).  Kelley was convicted of four counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; and three counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2.   In this opinion we address whether the district court erred in admitting evidence of bogus account statements sent by the defendant to the victims on the grounds that such evidence is impermissible in the context of the charged securities violations when the account statements were sent after the purchases of the securities and were not made in connection with the purchase or sale of securities. We hold that although the use of bogus account statements to lull defrauded investors is not in and of itself a securities law violation, the use of such statements is relevant as evidence to prove, *inter alia*, the defendant's intent to defraud and the extent of the scheme employed.  In a separate summary order filed along with this opinion, we resolve the remaining issues on appeal.  For the reasons stated herein and in that summary order, the judgment of conviction is affirmed.

## BACKGROUND

From 1999 until 2004, Defendant-appellant Kevin O. Kelley operated Acorn Research & Management, Inc. ("Acorn"), where he worked as a stock broker.  Kelley was also employed as a registered representative of Royal Alliance, a broker-dealer, and served as the managing executive of its Stamford, Connecticut office.  Kelley took advantage of his position as a stock broker to violate

2

securities laws and to defraud his stock brokerage clients through schemes involving four separate securities: Coyote Network Systems ("Coyote"), First Venture Leasing ("FVL"), E-Tel Corporation ("E-Tel"), and AusAm Biotechnologies ("AusAm").

In January 2000, Kelley and two partners formed a consulting firm, KRJ, LLC, which entered into a consulting agreement with Coyote. As part of the agreement, KRJ received 2 million shares of Coyote stock, a portion of which was held in an escrow account to be released to KRJ if certain stock price targets were met and maintained. The stock was released from escrow to KRJ in March 2000, and it was subsequently exchanged by KRJ in April 2000 for $12.4 million. From March 2000 through September 2000, a time period that overlapped with KRJ's consulting agreement, Kelley, in his role as a stock broker, purchased Coyote stock for some of his clients without their authorization and encouraged other clients to purchase Coyote stock without disclosing to them his own interests in Coyote. On December 14, 2000, Coyote filed for bankruptcy, resulting in approximately $1.4 million in losses for Kelley's client-investors.

Around the same time as the Coyote scheme occurred, Kelley also encouraged his clients to purchase limited partnership interests in FVL, in which he owned a majority interest. Kelley told his clients that FVL was a safe, government-secured investment. As with Coyote, Kelley did not disclose to his clients his own personal interest in the company. Also, Kelley did not invest in FVL all of the deposited funds intended for purchasing interests in that entity; instead he misappropriated some of his clients' funds for his own use. FVL stopped receiving any revenue by May 2002, and the stock was practically worthless by January 2004. At least through June 2004, however, Kelley continued to mislead his clients about their investments, sending them bogus account statements

3

which overstated the value of their investments in FVL.[1]

Kelley employed a similar scheme with respect to E-Tel, in which he held stock and served as a director. Kelley misappropriated for his own use clients' funds meant for investment in E-Tel. Testifying in his own defense, Kelley asserted that he had not misappropriated the funds, but that he had instead sold his own shares to his clients. Kelley introduced no evidence to support this claim. By mid-2003, E-Tel had gone out of business and the investments were essentially of no value. Kelley continued, however, to mislead his clients about their investments in E-Tel by issuing bogus account statements through June 2004.[2]

With respect to AusAm, Kelley served as a director of the company until 2001. As a director, Kelley had the opportunity to purchase shares in AusAm, but the record contains no evidence that he exercised this option. Kelley encouraged his clients to send him funds to invest in AusAm, which Kelley then misappropriated for his own use. Kelley again asserted in his own defense that he had sold his own personal holdings to his clients. There are no records of such sales, nor are there records that show either Kelley or any of his clients ever owned stock in AusAm. As with the other schemes, Kelley again misled his clients by falsely representing the value of their investments in

---

[1] Specifically, Kelley issued account statements to three different clients. These statements overstated the value of their FVL investments: on January 21, 2004, Kelley faxed an account statement to Carol Raybin which stated that her investment in FVL was valued at $250,000; on March 31, 2004, he issued an account statement to Michael and Barbara Greco which showed their investment in FVL to be worth $138,712; and on June 30, 2004, Kelley issued a statement to Edward Wolak indicating that his investment was worth $50,000.

[2] For example, the January 21, 2004 statement Kelley issued to Ms. Raybin indicated that her investment in E-Tel was worth $45,000; and the June 30, 2004 statement issued to Mr. Wolak listed his investment in E-Tel as valued at $50,000.

4

bogus account statements,[3] even though no actual investment had been made.

On February 14, 2006, a superseding indictment issued charging Kelley with four counts of securities fraud and three counts of wire fraud stemming from four schemes involving securities in Coyote, E-Tel, and AusAm and involving the limited partnership investments in FVL. As part of describing Kelley's schemes to defraud, the superseding indictment referred to account statements sent to Kelley's clients which misrepresented the value of their investments in FVL, E-Tel, and AusAm.[4]

Prior to the start of the jury trial, Kelley moved to strike the portions of the superseding indictment that referred to bogus account statements, arguing that the use of bogus account statements is insufficient to establish a securities violation because the false statements were not made in connection with the sale or purchase of securities. In a March 6, 2006 order, the district court denied Kelley's motion to strike the references to the bogus account statements, finding instead that the statements were relevant to Kelley's intent and his attempts to evade detection.

During the trial, the government presented testimony from Kelley's clients, executives and employees of the four different companies whose securities were involved in Kelley's schemes, an executive of Royal Alliance, Kelley's assistant at Acorn, and a Postal Inspector. The government

---

[3] The March 31, 2004 statement issued to the Grecos showed their investment in AusAm was valued at $28,800. The June 30, 2004 statement issued to Mr. Wolak showed his investment in AusAm was worth $68,750.

[4] The superseding indictment stated that "Kelley repeatedly misled investors as to the value of their investments in FVL by sending them false account statements that over-valued their investments,"; "Kelley hid E-Tel's failure from the clients by failing to disclose E-Tel's failure to them, and by distributing false and misleading account statements to them," ; and "Kelley hid from his clients his failure to invest their funds in AusAm by distributing false and misleading account statements to them."

5

also introduced into evidence the Acorn account statements in which Kelley had overvalued the clients' investments in FVL, E-Tel, and AusAm. Kelley testified in his own defense and called an additional client to testify on his behalf. In its closing argument, the government asserted that Kelley used the bogus account statements as a means of evading detection and to deter his clients from seeking to sell their investments. In response, Kelley argued that the statements were insufficient to establish a violation of securities laws because the statements were issued only after the securities had been purchased and were not made in connection with the sale or purchase of securities.

Following jury deliberations, Kelley was convicted of four counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5; and three counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. On November 29, 2006, Kelley was sentenced to 170 months' imprisonment, and the district court also ordered restitution in the amount of $4,332,517 and forfeiture of $15 million.

## DISCUSSION

On appeal, Kelley argues that the district court erred in permitting evidence of the bogus account statements to be admitted into evidence. In the course of introducing his argument on this point, Kelley notes that the district court denied his motion to strike references to the bogus account statements from the indictment. Because Kelley concludes this argument in his brief by asserting that "the District Court erred in permitting the government to introduce such evidence," we construe Kelley's argument solely as a challenge to the district court's evidentiary rulings.

We review evidentiary rulings for abuse of discretion. *United States v. Szur*, 289 F.3d 200, 217 (2d Cir. 2002). We will find an abuse of discretion only where "the trial judge ruled in an arbitrary or irrational fashion." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *see also*

6

*United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) ("We will second-guess a district court 'only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally.'" (quoting *United States v. Valdez*, 16 F.3d 1324, 1332 (2d Cir. 1994))). Generally, "all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded." *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) (citing Fed. R. Evid. 402). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Section 10(b) of the Securities Exchange Act of 1934, of which Kelley was convicted, makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j; *see also* 17 C.F.R. § 240.10b-5 (making it "unlawful for any person . . . to employ any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security"). A fraudulent statement made in violation of section 10(b) must therefore be a statement made "in connection with the purchase or sale of any security." *See SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("While the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b) . . . neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act.").

Kelley contends that because the bogus account statements were created and disseminated two to four years after the purchases of the related securities, they were not made in connection with the sale or purchase of a security as required for a section 10(b) violation. In support of his position,

7

Kelley cites two cases from the district courts: *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 639 (S.D.N.Y. 2004) (finding in a civil action that confirmation notices and monthly account statements issued after the purchase of securities were not actionable statements under section 10(b) or Rule 10b-5 when they occurred after the fact and plaintiff did not rely on the statements in making the purchase), and *Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 443 (E.D.N.Y. 1987) ("Statements made subsequently, even if fraudulent, do not make out a 10b-5 violation."). Kelley's argument, however, misses the point and disregards the purpose for which the bogus account statements were offered into evidence.

The section 10(b) violations that were charged stem not from the bogus account statements themselves, a *sine qua non* for Kelley's argument to be persuasive, but instead stem from Kelley's larger schemes to induce his clients to purchase the securities or to use his clients' funds to purchase the securities without their authorization. References to the bogus statements were admitted as evidence because they tended to demonstrate Kelley's intent to defraud his clients and the scope of the schemes he employed. *See Perez*, 387 F.3d at 209 ("While falsehoods told by a defendant in hope of evading prosecution are not themselves sufficient evidence on which to base a conviction, such falsehoods may strengthen an inference of guilt supplied by other evidence."). They were never offered as proof of independent violations of section 10(b).

The bogus account statements were relevant evidence with respect to the charged securities law violations. *See SEC v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982) ("[A] scheme to defraud may well include later efforts to avoid detection of the fraud." (internal quotations omitted)). The statements provided the jury with evidence both that Kelley had intended to defraud his clients and that he continued efforts to avoid detection by deceiving his clients about the value of the

8

investments, often up to two years after a particular investment ceased to have any value. The account statements also indicate that Kelley's actions in defrauding his clients were not simple mistakes but were instead part of a larger, intentional scheme to defraud. *See id.* at 144 ("The court was entitled to consider the lulling activities because they were evidence of a scheme which, viewed as a whole, was sufficiently closely connected to the sale and was relevant to the question of intent." (footnote omitted)). We hold, therefore, that the district court did not abuse its discretion in admitting evidence concerning the bogus account statements that were generated and disseminated several years after the victims had been induced to invest.

## CONCLUSION

For the reasons stated herein and in an accompanying summary order, the judgment of the district court is AFFIRMED.