18-3710(CON)
*United States v. Percoco et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

August Term 2019

(Argued: March 12, 2020      Decided: September 8, 2021)

Docket Nos. 18-3710(CON), 18-3712(CON), 18-3715(CON), 18-3850(CON)

---

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, ALAIN KALOYEROS, AKA DR. K,

*Defendants-Appellants,*

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

Before:

RAGGI, CHIN, AND SULLIVAN, *Circuit Judges*.

———————————

Consolidated appeals from judgments of the United States District Court for the Southern District of New York (Caproni, *J.*) convicting defendants-appellants of engaging in a scheme to rig the bidding processes for New York State-funded projects in Syracuse, New York, and Buffalo, New York. Defendants-appellants appeal their convictions on several grounds, including the sufficiency of the evidence, purported errors in the jury instructions and evidentiary rulings, and prosecutorial misconduct.

AFFIRMED.

———————————

MATTHEW D. PODOLSKY, Assistant United States Attorney (Robert L. Boone, Janis M. Echenberg, *and* Won S. Shin, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, New York, *for Appellee.*

ALEXANDRA A.E. SHAPIRO (Daniel J. O'Neill *and* Fabien M. Thayamballi, *on the brief*), Shapiro Arato Bach LLP, New York, New York, *for Defendant-Appellant Steven Aiello.*

PAUL L. SHECHTMAN, Bracewell LLP, New York, New York, *for Defendant-Appellant Louis Ciminelli*.

MILTON L. WILLIAMS (Jacob Gardener *and* Avni P. Patel, *on the brief*), Walden Macht & Haran LLP, New York, New York, for *Defendant-Appellant Joseph Gerardi*.

MICHAEL C. MILLER (Bruce C. Bishop, Reid H. Weingarten, Michael G. Scavelli *and* David B. Hirsch, *on the brief*), Steptoe & Johnson LLP, New York, New York and Washington, DC, *for Defendant-Appellant Alain Kaloyeros*.

---

CHIN, *Circuit Judge*:

Defendants-appellants Steven Aiello, Joseph Gerardi, Louis Ciminelli, and Alain Kaloyeros appeal from judgments entered by the district court (Caproni, *J.*), convicting them of conspiracy to engage in wire fraud by engaging in a scheme to rig the bidding processes for New York State-funded projects, in violation of 18 U.S.C. § 1349. Aiello, Gerardi, and Kaloyeros also appeal from their convictions for wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, in connection with rigging the bidding for projects in Syracuse, New York, and Ciminelli and Kaloyeros appeal from their convictions for wire fraud under the same provisions for rigging the bidding for projects in Buffalo, New York.

- 3 -

Gerardi also appeals his conviction for making false statements to federal officers, in violation of 18 U.S.C. § 1001(a)(2).[1]

On appeal, defendants challenge the sufficiency of the evidence with respect to the charged wire fraud conspiracies, the instructions to the jury regarding the right-to-control theory of wire fraud and the good faith defense, the preclusion of evidence regarding the success of the projects awarded to defendants through the rigged bidding system and the admission of evidence from competitors regarding the range of fees typically charged by other companies in the market, and the district court's denial of Gerardi's motion to dismiss his false statement charge for alleged prosecutorial misconduct.[2]

---

[1]    The superseding indictment charged the defendants and others with eighteen counts stemming from alleged corruption and abuse of power. The district court severed the counts of the superseding indictment into two trials, one for the counts involving alleged bribes taken by Joseph Percoco, the former Executive Deputy Secretary to the former Governor Andrew Cuomo, and the second on the counts stemming from the bid-rigging scheme discussed above. Both trials resulted in convictions. The appeals were consolidated. This opinion addresses only those appeals of the convictions at the second trial. We address the issues relating to the bribery trial in a separate opinion.

[2]    Defendants also contend that the right-to-control theory of wire fraud is itself invalid, primarily arguing that the right to control one's own assets is not "property" within the meaning of the wire fraud statute. Defendants acknowledge that the right-to-control theory of wire fraud is well-established in Circuit precedent, *see, e.g.*, *United States v. Finazzo*, 850 F .3d 94, 105-09 (2d Cir. 2017), which controls this panel. Insofar as they raise the argument to preserve it for further review, we need not discuss it further.

We conclude that there was sufficient evidence to support each of defendants' convictions, the district court did not err in instructing the jury, it did not abuse its discretion in admitting the challenged evidence while precluding other evidence, and it did not err in denying Gerardi's motion to dismiss the false statement charge. Accordingly, the judgments of the district court are AFFIRMED.

## BACKGROUND

### I. *The Facts*[3]

#### A. *The Buffalo Billion Initiative*

In 2012, then-Governor Andrew Cuomo launched an initiative to develop the greater Buffalo area through the investment of $1 billion in taxpayer

---

Nor are we required to reconsider our precedent by *Kelly v. United States*, 140 S. Ct. 1565 (2020). There, the Supreme Court ruled that a "scheme to reallocate the [George Washington] Bridge's access lanes" was not property for purposes of the wire fraud statute because lane realignment by the Port Authority was an "exercise of regulatory power," not "the taking of property." *Id.* at 1573-74. *Kelly* is inapposite here because this case does not concern the exercise of regulatory power. *See United States v. Gatto*, 986 F.3d 104, 116 (2d Cir. 2021) (distinguishing *Kelly* on basis that defendants there were motivated by "political retaliation" and not taking of property). We further note that the Supreme Court recently denied a petition for *certiorari* that presented challenges to the right-to-control theory similar to those raised by defendants here. *See Binday v. United States*, 140 S. Ct. 1105 (2020).

[3]     Because defendants appeal their convictions following a jury trial, "our statement of the facts views the evidence in the light most favorable to the government, crediting

- 5 -

funds; the project became known as the "Buffalo Billion" initiative. App'x at 1034. At the time, Kaloyeros was the head of the College of Nanoscale Science and Engineering ("CNSE"), an economic development and research organization that formed part of the University of Albany -- itself part of the State University of New York ("SUNY"). In late 2011, Kaloyeros hired Todd Howe, a consultant and lobbyist with a longstanding relationship with the Cuomo administration, to help improve his relationship with the Governor's office. In exchange for Howe's help, Kaloyeros arranged to have SUNY's Research Foundation pay Howe $25,000 per month.

With Howe's assistance, Kaloyeros's relationship with the Governor's office improved and, in 2012, Kaloyeros was put in charge of developing proposals for projects under the Buffalo Billion initiative. In this role, Kaloyeros was to propose development projects he believed would attract private industry to the upstate region. Once a proposed project was approved, Kaloyeros would also oversee the development of the project, which was to be

---

any inferences that the jury might have drawn in its favor." *See United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016).

paid for by public funds but ultimately leased out for use to private companies with the aim of generating jobs for the upstate economy.

Due to restrictions on state agencies engaging in public-private partnerships, Kaloyeros used Fort Schuyler Management Corporation ("Fort Schuyler"), a nonprofit corporation established to support the missions of SUNY and other affiliated organizations, as the vehicle for purchasing the land and developing the facilities for the Buffalo Billion development projects. Fort Schuyler was controlled by a Board of Directors (the "FS Board") whose members (among them Kaloyeros) were appointed by SUNY and the SUNY Research Foundation.

### B.    *The Scheme*

By the summer of 2013, Howe had not only helped Kaloyeros secure a central role in the Buffalo Billion initiative but was also helping Kaloyeros pursue his additional goal of separating CNSE from the University of Albany and becoming president of the newly independent university.[4] At the same time that the SUNY Research Foundation, at Kaloyeros's direction, was paying Howe

---

[4]    Kaloyeros ultimately received support from the most senior members of the Governor's staff, commonly referred to as the Governor's "Executive Chamber," Gov't App'x at 500, to form a new university, SUNY Polytechnic Institute, and to become that university's president.

to act as a consultant on these state-sponsored projects, two other construction companies -- COR Development Company ("COR Development"), owned by Aiello and Gerardi, and LPCiminelli, owned by Ciminelli -- were paying Howe for his help in obtaining state-funded work  Kaloyeros and Howe then began conspiring to deliver the Buffalo Billion state contracts to Howe's clients.

Although Kaloyeros had substantial influence and control over the Buffalo Billion projects, Fort Schuyler's role in the selection process foreclosed his ability to immediately award the contracts to Howe's clients.  In selecting developers and construction managers, Fort Schuyler employed a request-for-proposal ("RFP") process under which it would announce its needs for each project through an RFP and then permit interested parties to compete for the projects by submitting bids and a description of their qualifications.[5]  Although Kaloyeros was responsible for designing and drafting the RFP documents, the authority to award a contract rested with the FS Board, which typically did so only after an evaluation team at Fort Schuyler reviewed the responses and made a recommendation.  But Kaloyeros and Howe circumvented Fort Schuyler's typical bidding process in two ways.

---

[5]     The RFP process is generally used to help ensure that funds "are spent in a transparent and a competitive way."  App'x at 1037.

First, in August 2013, Kaloyeros successfully proposed that Fort Schuyler issue two RFPs -- one for Syracuse (the "Syracuse RFP") and another for Buffalo (the "Buffalo RFP") -- to identify "a strategic development partner" in each region. Notably, unlike Fort Schuyler's usual RFPs, the Syracuse and Buffalo RFPs would "not focus on a specific project." App'x at 1050. Indeed, the then-chairman of Fort Schuyler's Board of Directors testified that Fort Schuyler had no specific projects in mind for either region at the time of Kaloyeros's proposal, and the Syracuse and Buffalo RFPs that were ultimately issued sought generally "to establish a strategic research, technology outreach, business development, manufacturing, and education and workforce training partnership with a qualified developer" in those regions, "for potential research, technology outreach, business development, manufacturing, and education and training hubs," App'x at 1912. The successful bidders would be "designat[ed] . . . as the PREFERRED DEVELOPER" for the region, App'x at 1912, and, thus, would have the first opportunity to negotiate with Fort Schuyler for the specific projects Fort Schuyler eventually identified.

Second, Kaloyeros and Howe worked to draft these RFPs in a way that would give COR Development and LPCiminelli an advantage unbeknownst

to others at Fort Schuyler. Notably, Kaloyeros solicited, through Howe, qualifications or attributes of COR Development and LPCiminelli to include as requirements in the Syracuse RFP and Buffalo RFP so that the bidding process would favor the selection of these companies as preferred developers.

Through a series of email and in-person communications in August and September of 2013, Howe worked with Aiello, Gerardi, Ciminelli, and Kevin Schuler, an executive at LPCiminelli, to come up with a list of qualifications -- which they referred to as "vitals" -- that, once incorporated into the RFPs, would improve their chances of being selected for the Buffalo and Syracuse projects.[6] *See, e.g.*, App'x at 1560, 1647-49. This information was then relayed to Kaloyeros, who, after asking for more specificity, *see* App'x at 1578, and even soliciting feedback on proposed drafts, incorporated the doctored qualifications into the RFP drafts that were ultimately submitted to the FS Board for approval.

In September and October of 2013, the Syracuse and Buffalo RFPs were issued by the FS Board, as prepared by Kaloyeros. Notably, the final Syracuse RFP contained a fifteen-year experience requirement, which directly matched the experience of COR Development, along with a requirement that the

---

[6]     Schuler pleaded guilty shortly before trial pursuant to a cooperation agreement with the government, and he testified at trial as a government witness.

preferred developer use a particular type of software (which COR Development also used), and other language lifted directly from the list of qualifications Aiello and Gerardi had prepared and sent to Howe. Similarly, the final Buffalo RFP contained specifications unique to LPCiminelli, including "[o]ver 50 years of proven experience" in the field, App'x at 1914, a requirement that the preferred developer be headquartered in Buffalo, and additional language lifted directly from talking points provided to Kaloyeros from Ciminelli and Schuler.

## C.    *The Bidding*

Both the Syracuse RFP and Buffalo RFP imposed a "blackout period" between the time of their issuance and the deadline for bidders to submit proposals, during which time all communication between interested vendors and the RFP issuer were to occur in designated, open forums or through a designated point person to ensure equal access to information and avoid any unfair advantages among competitors. Notwithstanding this restraint, Aiello, Gerardi, Ciminelli, and Schuler continued to discuss their applications with Howe and Kaloyeros during this period. For example, Aiello emailed Howe to warn him about a potential competitor for the Syracuse RFP, and Schuler reached out to Kaloyeros, through Howe, to express concern over public statements made by

- 11 -

the Governor that he believed might remove their advantage in securing the Buffalo RFP.

Kaloyeros, for his part, continued to provide secret assurances to Aiello, Gerardi, and Schuler, through Howe, that they would be awarded the contracts while simultaneously taking steps to ensure that the bidding process appeared open and fair to the public. In one instance, Kaloyeros learned from Howe (who had learned from Schuler) that another company was representing itself to others as a gatekeeper for the Buffalo RFP project. Kaloyeros quickly denied the rumor to Howe, and then went on to email the competitor, copying Fort Schuyler employees and members of FS Board, reminding the competitor that Fort Schuyler could "neither endorse nor support a pre-cooked process or any process that singles out anyone" before the bidding period was closed. Gov't App'x at 738.

Kaloyeros also made modifications to the Buffalo RFP in response to public scrutiny. After the 50-year experience requirement caught the attention of an investigative reporter who began to ask questions about its origin, Kaloyeros claimed that the requirement was "a typographical error," and changed it back to 15 years, as in the Syracuse RFP. Gov't App'x at 733. Presumably also to combat

any perception that the RFP was tailored to a particular bidder, Kaloyeros further decided that Fort Schuyler would name two preferred developers for the Buffalo projects, instead of one, although he continued to allow Ciminelli and Schuler to unduly influence the process. Not only did Kaloyeros continue to assure Schuler and Ciminelli that LPCiminelli would still get the contract for the larger of the two projects, but he allowed them to select the second preferred developer.

### D. *The Final Selections and Awarding of Contracts*

Once the RFP responses were submitted, evaluation teams made up of Fort Schuyler employees reviewed and scored the bids. Kaloyeros recused himself from the evaluation of the bids and the FS Board vote, but he failed to disclose his relationships to any of the bidders. Ultimately, COR Development submitted the only response to the Syracuse RFP and the Fort Schuyler evaluation team recommended that COR Development be selected as the preferred developer for Syracuse. Three companies submitted responses to the Buffalo RFP, and the Fort Schuyler evaluation team recommended that LPCiminelli and McGuire Development Company ("McGuire"), the bidder

- 13 -

Schuler and Ciminelli selected, be named preferred developers for the Buffalo contracts.

Through resolutions adopted on December 19, 2013, and January 28, 2014, the FS Board formally announced that the Syracuse RFP would be awarded to COR Development and that the Buffalo RFP would be awarded to LPCiminelli and McGuire. Following passage of the resolutions, Kaloyeros awarded two construction projects to COR Development -- the building of a film studio worth approximately $15 million in revenue and the construction of a solar panel plant valued at approximately $90 million. He awarded LPCiminelli the "Riverbend project," which ultimately became a $750 million construction project.

### E. *Gerardi's Proffer*

During its investigation into the rigging of the Buffalo and Syracuse RFPs, the government had a proffer session with Gerardi. At the session, Gerardi told federal officers that he did not ask for the Syracuse RFP to be tailored to help COR Development and that his handwritten mark-up of the draft Syracuse RFP reflected his freely given assistance in helping Howe's law firm, which Gerardi stated was drafting the RFP to make the RFP broader and more open to other competitors. Gerardi also stated that his written comment

regarding the inclusion of COR Development's software as a qualification in the Syracuse RFP as being "too telegraphed," really meant "too telescoped," reflecting his concern that the qualification might unfairly prevent other competitors from applying. App'x at 1328.

Gerardi further told federal officers that although it was true that COR Development did not have audited financials, his requests to remove the audited financial requirement from the Syracuse RFP was not to help COR Development, but rather to loosen a requirement that might prevent other companies from applying. Finally, Gerardi told investigators that he had no idea why, after he requested that the Syracuse RFP permit a financial institution reference letter in lieu of audited financials, Howe had emailed Gerardi to confirm that Kaloyeros had included such a provision. According to Gerardi, he had merely responded "[g]reat" and "[t]hank you" to Howe's email to be polite. App'x at 1329.

## II. *Proceedings Below*

On September 19, 2017, a federal grand jury returned a superseding indictment charging eighteen counts, four of which are relevant to this appeal. Count One charged Kaloyeros, Aiello, Gerardi, Ciminelli, and others with

conspiracy to commit wire fraud in connection with a scheme to rig the bidding processes for the Buffalo and Syracuse RFPs, in violation of 18 U.S.C. § 1349. Count Two charged Kaloyeros, Aiello, and Gerardi with wire fraud in connection with rigging the bidding process for the projects in Syracuse, in violation of 18 U.S.C. §§ 1343 and 2. Count Four charged Kaloyeros, Ciminelli, and others with wire fraud in connection with rigging the bidding process for the projects in Buffalo, in violation of 18 U.S.C. §§ 1343 and 2. And Count Sixteen charged Gerardi with making false statements to federal officers in connection with the conduct charged in Counts One and Two, in violation of 18 U.S.C. § 1001(a)(2).[7]

Trial on Counts One, Two, Four, and Sixteen commenced on June 11, 2018. At the close of the government's case, the defense made oral Rule 29 motions attacking the sufficiency of the government's evidence, which were renewed after the district court permitted the government to reopen its case for the limited purpose of supplementing its evidence of venue. After the

---

[7]     Although two other counts in the superseding indictment, Counts Three and Five, also arose from the Buffalo Billion scheme, the government did not proceed to trial on those counts, and they were dismissed at sentencing and in defendants' final judgments.

- 16 -

government rested, the defense put on an affirmative case consisting of three witnesses.

On July 12, 2018, the jury returned a verdict of guilty on all counts. Defendants renewed their Rule 29 motions, which were denied by the district court at each of the defendants' respective sentencings. During four separate sentencing hearings held in December 2018, the district court sentenced defendants as follows: Ciminelli to 28 months' imprisonment, Gerardi to 30 months' imprisonment, Aiello to 36 months' imprisonment, and Kaloyeros to 42 months' imprisonment. Defendants were also ordered to pay fines and forfeit funds in varying amounts.

These appeals followed.

*DISCUSSION*

Four issues are presented: (1) the sufficiency of the evidence to support the fraud counts of conviction and venue for Count Two; (2) the instructions to the jury regarding the right-to-control theory of wire fraud and the good faith defense; (3) the preclusion of evidence regarding the merits and public benefits of the projects awarded to defendants and admission of evidence from competitors regarding the range of fees typically charged by other

- 17 -

construction management companies in the market; and (4) the district court's denial of Gerardi's motion to dismiss his false statement charge for alleged prosecutorial misconduct.  We address each issue in turn.

## I.  *Sufficiency of the Evidence*

Defendants challenge (1) the sufficiency of the evidence supporting their convictions for the charged wire fraud conspiracy (Count One) and substantive wire frauds (Counts Two and Four) and (2) the sufficiency of the evidence supporting venue for Count Two.  We conclude that the evidence was sufficient as to both.

### A.  *Standard of Review*

We review preserved claims of insufficient evidence *de novo*.  *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010).  When assessing a sufficiency of the evidence challenge, we "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, alteration, and quotation marks omitted), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017).  We will

not set aside a conviction as long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

Unlike the elements of a charged crime, the government is required to prove venue only by a preponderance of the evidence. *United States v. Smith*, 198 F.3d 377, 382 (2d Cir. 1999). "We review *de novo* the District Court's determination that the evidence was sufficient to support a finding that venue was proper." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018). Where a defendant challenges venue following a jury verdict, we "review the record evidence in the light most favorable to the government, drawing every reasonable inference in support of the jury's verdict." *Id*.

### B.	*The Right-to-Control Theory of Wire Fraud*

Defendants first contend that the evidence was insufficient to support their convictions under a right-to-control theory of wire fraud because the government failed to prove economic harm or the requisite intent to defraud.

- 19 -

**1.** *Applicable Law*

"The federal mail and wire fraud statutes penalize using the mails or a wire communication to execute 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting 18 U.S.C. §§ 1341, 1343). "Since a defining feature of most property is the right to control the asset in question, . . . property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets." *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019) (internal quotation marks and alteration omitted), *cert. denied sub nom. Gross v. United States*, 140 S. Ct. 1224 (2020). This Court has endorsed a "right-to-control theory" of wire fraud that allows for conviction on "a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity of potentially valuable economic information." *Id.* (internal quotation marks and alteration omitted); *accord United States v. Gatto*, 986 F.3d 104, 126 (2d Cir. 2021).

The right-to-control theory requires proof that "misrepresentations or non-disclosures can or do result in tangible economic harm." *United States v.*

*Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). A "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (internal quotation marks and alteration omitted). Examples include when the scheme "affected the victim's economic calculus or the benefits and burdens of the agreement," "pertained to the quality of services bargained for," or "exposed the [victim] to unexpected economic risk." *Id.* at 570-71. It is, however, "not sufficient . . . to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations." *Id.* at 570.

To prove a scheme to defraud, "[i]t need not be shown that the intended victim of the fraud was actually harmed; it is enough to show defendants contemplated doing actual harm." *United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991). In a right-to-control case, "it is not necessary that a defendant intend that his misrepresentation actually inflict a financial loss -- it suffices that a defendant intend that his misrepresentations induce a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision." *Binday*, 804 F.3d at 579. Thus, the requisite

intent is established if "the defendant's misrepresentations foreseeably concealed economic risk or deprived the victim of the ability to make an informed economic decision." *Id.* at 578.

## 2. *Analysis*

### i. *Economic Harm*

The trial evidence demonstrated that the defendants, by secretly tailoring the Buffalo and Syracuse RFPs, took steps to reduce the possibility that companies other than their own would be seen as competitive, or even qualified at all, for the bids at issue. There was also evidence that Fort Schuyler employed the RFP process precisely because of its desire for free and open competition, and that the FS Board relied on this aspect of the process to achieve its economic objective -- selecting the lowest-priced or best-qualified vendor. Thus, in rigging the RFPs to favor their companies, defendants deprived Fort Schuyler of "potentially valuable economic information," *id.* at 570 (internal quotation marks omitted), that would have resulted from a truly fair and competitive RFP process.

Defendants nevertheless insist that the government failed to prove economic harm for two interrelated reasons. First, defendants maintain that

even if the Syracuse and Buffalo RFPs were not competitive, the absence of competition could not have caused harm to Fort Schuyler, because the rigged RFPs merely awarded COR Development and LPCiminelli preferred developer status, and did not affect the terms of the separate, subsequently negotiated development contracts. In other words, the rigged RFPs only afforded these companies "the right to negotiate with Fort Schuyler for work that would be forthcoming." Ciminelli Br. at 3-4. Second, defendants assert that the government did not offer evidence that another company with lower prices, better quality, or better value would have applied and been selected for either the Syracuse or the Buffalo contracts. We are not persuaded by either argument.

As to the first argument, as an initial matter, the record does not support the clean division between the award of preferred developer status and the subsequent awards of particular development contracts that defendants describe. Although COR Development and LPCiminelli were not guaranteed any project once they were chosen preferred developers, they indisputably had "a leg up because they had been preselected," Trial Tr. at 221, as the designation "guaranteed them the beginning of a partnership with . . . Fort Schuyler," Trial Tr. at 341. Further, Fort Schuyler had an interest in seeing its proposed projects

come to fruition, and the costs attendant to identifying another developer after investing in identifying preferred developers would be a strong disincentive to walking away from those developers. Indeed, if preferred developer status were as inconsequential as defendants suggest, no developers would bother responding to the RFP. Accordingly, the rigged RFP process constituted more than mere "fraudulent inducements to gain access to" the development contracts, which would not be sufficient to support the wire fraud convictions here. *See Schwartz*, 924 F.2d at 421. Rather, COR Development and LPCiminelli's selection as preferred developers made it much more likely that they would be awarded the contracts. Moreover, while we have recognized "a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid -- which do not violate the mail and wire fraud statutes -- and schemes that depend for their completion on a misrepresentation of an essential element of the bargain -- which do," *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007), the evidence, viewed in the light most favorable to the government, *see Rosemond*, 841 F.3d at 99-100, demonstrated that a competitive process was "essential" both to the selection of preferred developers and -- in light of the

preferred developers' "leg up" for projects that then arose -- to the award of the subsequent development contracts.

As to the second argument, we recognize that many of our right-to-control precedents have involved more tangible evidence of economic harm than is presented in this case. *See, e.g., Finazzo*, 850 F.3d at 100-02, 114-15 (discussing merchandising company employees' testimony that company executive who steered company to particular vendor in exchange for kickbacks deprived company of specific cost savings and better-quality goods); *Binday*, 804 F.3d at 572-74 (finding economic harm in misrepresentation to insurers that insurance policies were not intended for sale to third parties where insurance executives "testified unequivocally and at length that their companies refused to issue [such policies] for economic reasons," including that those policies "ha[d] different economic characteristics that could reduce their profitability"). Here, the government offered little evidence that other companies would have successfully bid for the projects and then either charged less or produced a more valuable product absent the fraud.[8] But "[i]t is not required that the victim[] of the scheme

---

[8] There was evidence introduced at trial that absent the fraud, Fort Schuyler would have considered more, and perhaps stronger, applications in response to the RFPs. One representative from a rival company testified that he considered submitting

in fact suffered harm." *Binday*, 804 F.3d at 569; *accord Gatto*, 986 F.3d at 123-24 (rejecting argument that wire fraud statute "requires that property or money be obtained *by* the defendant *from* the victim"). And that evidence of actual economic harm was presented in other right-to-control cases does not make such evidence a requisite for conviction.

We are similarly unpersuaded by defendants' arguments that rigging the Buffalo and Syracuse RFPs was not wire fraud because it merely induced negotiations, *see Shellef*, 507 F.3d at 109, or because Fort Schuyler still received the benefit of its bargain, *see Binday*, 804 F.3d at 570. The bargain at issue was not the terms of the contracts ultimately negotiated, but instead Fort Schuyler's ability to contract in the first instance, armed with the potentially valuable economic information that would have resulted from a legitimate and

---

a bid for the Buffalo RFP but decided not to because aspects of the RFP, including its "vagueness" and fifty-year experience requirement, left him with the impression that the project "was being steered towards a local competitor." App'x at 1296. Notably, both that company's representative and a representative of another regional construction management company that applied to the Buffalo RFP as part of a team testified to having construction management fees were typically lower than those of both LPCiminelli and COR Development. Accordingly, if Fort Schuyler had been able to consider additional applications, it might have selected a preferred developer who could offer more favorable economic terms for development contracts that Fort Schuyler eventually negotiated.

competitive RFP process. Depriving Fort Schuyler of that information was precisely the object of defendants' fraudulent scheme, and for Fort Schuyler, it was an essential element of the bargain.[9] This was plainly sufficient for a wire fraud conviction under our caselaw. *See Shellef*, 507 F.3d at 108 ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid -- which do not violate the mail or wire fraud statutes -- and schemes that depend for their completion on a misrepresentation of an essential element of the bargain -- which do violate the mail and wire fraud statutes.").

### ii. Fraudulent Intent

We also reject the arguments made by Aiello, Gerardi, and Ciminelli that there was insufficient evidence of their intent to defraud. Emails introduced at trial showed all three defendants communicating with Howe on how to rig the RFP process. *See, e.g.*, App'x at 1644 (email from Howe to Aiello discussing LPCiminelli's initial ideas for rigging the RFP); App'x at 1685-86 (email from

---

[9]     *See, e.g.*, App'x at 1809 (Memorandum of Understanding ("MOU") between Fort Schuyler and COR Development indicating that COR Development was selected "after a competitive process, including the RFP"); Gov't App'x at 780 (same as to LPCiminelli); *see also* Gov't App'x at 766 (Notice to Proceed with COR Development describing the MOU with COR as the result of a "competitive bidding process under the RFP"); Gov't App'x at 788 (same as to LPCiminelli).

Howe to Aiello containing advance copy of Syracuse RFP, which Aiello forwarded to Gerardi and others at COR Development); App'x at 1656 (email from Gerardi with a written markup of the advance copy of the Syracuse RFP, in which he expressed his concern that Kaloyeros had made it "too telegraphed"); App'x at 1593-61 (email from Kaloyeros to Ciminelli containing draft Syracuse RFP with message: "Draft of relevant sections from RFP enclosed [. . .] obviously, we need to replace Syracuse with Buffalo and fine tune the developer requirements to fit [. . .] hopefully, this should give you a sense where we're going with this [. . .] thoughts?").  On this evidence, a reasonable jury could have found beyond a reasonable doubt that Aiello, Gerardi, and Ciminelli knew about the scheme to rig the RFPs, and that it was at least foreseeable to them that doing so would deprive Fort Schuyler of its ability to award contracts that were the result of a fair and competitive bidding process.  The evidence of intent to defraud was therefore sufficient to uphold their convictions.  *See Binday*, 804 F.3d at 578 (intent established where shown that "the defendant's misrepresentations

foreseeably concealed economic risk or deprived the victim of the ability to make an informed economic decision").[10]

### C.   *Venue for Count Two*

Gerardi also argues that there was insufficient evidence to establish venue for Count Two, which charged him, Kaloyeros, and Aiello with wire fraud in connection with rigging the bidding process for the Syracuse RFP.  Although criminal prosecutions are to be brought in the district in which the crime was committed, *see* U.S. Const. art. III § 2; U.S. Const. Amend. VI; Fed. R. Crim. P. 18, where "the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue," *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985).  Instead, an offense committed in more than one district may be "prosecuted in any

---

[10]   Gerardi argues that "the RFP underwent multiple layers of drafting, review, and approval within Fort Schuyler . . . and by outside counsel, and there was no evidence of any objections raised by those parties or pressure applied by the defendants."  Gerardi Br. at 40.  The fact that others did not object, however, shows only that defendants managed to conceal their scheme.  That a victim may have been negligent or gullible is not a defense to fraud.  *See United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004).

district in which such offense was begun, continued, or completed."  18 U.S.C.

§ 3237(a).

Here, to establish venue for Count Two, it was enough for the

government to show by a preponderance of the evidence that Gerardi used, or

caused others to use, a wire to communicate with others in the Southern District

and did so in furtherance of the scheme to rig the Syracuse RFP.  *See United States*

*v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015) (noting that for a wire fraud charge

"venue lies where a wire in furtherance of a scheme begins its course, continues

or ends"); *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982) (finding venue

proper in light of "numerous telexes and telephone calls" by defendant and

caused by him to advance the alleged fraud in New York).[11]  The trial record

contained various wires relating to the Syracuse RFP sufficient to satisfy this

burden.  *See, e.g.*, App'x at 2217 (email from Howe to Kaloyeros sent in July 2013

---

[11]      The Southern District of New York includes Manhattan and the Bronx, as well as Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan Counties.  Both COR Development and LPCiminelli are based outside of New York City, and the contracts ultimately awarded to them by the RFPs were for construction projects that took place in different venues in the Western and Northern Districts of New York.  Still, neither the venue statute nor the Constitution requires the majority of the charged conduct to have occurred in the charged venue, as long as the offense was begun, continued, or concluded there.

while Howe was in the Washington, D.C./Maryland area and Kaloyeros was in Manhattan, setting up a time for Aiello and Kaloyeros to meet to discuss the bid-rigging scheme); App'x at 2209-20 (email sent from Howe while in the Washington, D.C./Maryland area to various employees at the Governor's Manhattan office encouraging the State to approve funds for Fort Schuyler to be used to pay COR Development); App'x at 2206-08 (emails among Aiello, Gerardi, Howe, and Joseph Percoco while Howe was in the Maryland/Washington D.C. area and Percoco was in Manhattan, in which Gerardi and Aiello asked for assistance getting State funds to pay vendors for work associated with the Syracuse RFP projects).

Accordingly, there was evidence from which a reasonable jury could conclude that venue in the Southern District of New York was established by a preponderance of the evidence as to Count Two, and we reject Gerardi's argument that the evidence was insufficient.[12]

---

[12] Gerardi argues that we cannot rely on these wires because they were admitted only after the district court granted the government's motion to reopen its case to supplement its venue evidence as to Count Four but not, in his view, as to Count Two. Because Gerardi raises this argument only in a footnote, we need not reach it. *See United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("It is well-established in this Circuit that we do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." (internal quotation marks and

## II.    *Jury Instructions*

Next, Aiello and Kaloyeros argue that their convictions should be set aside for errors in the jury instruction. Specifically, Aiello and Kaloyeros contend that the district court erred in instructing the jury on the right-to-control theory of wire fraud, and Kaloyeros also argues that the district court erred in instructing the jury regarding the good faith defense to wire fraud. We conclude that neither instruction was erroneous, and therefore we reject their challenges.

### A.    *Standard of Review*

We review *de novo* a defendant's challenge to the district court's jury instructions. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* (internal quotation marks omitted). Even where an instruction is found to contain errors, reversal is not warranted if the error was harmless. *See* Fed. R. Crim. P. 52(a); *United States v.*

---

alteration omitted)). It also bears noting that Gerardi makes only a passing reference to the district court's error in admitting these wires, and that reference is unsupported by any citation to any legal authority. *See Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 223 n.13 (2d Cir. 2018) (cursory argument without relevant authority need not be addressed). In any event, although the government initially moved to reopen with respect to Count Four (relating to the Buffalo RFP), it eventually sought to offer evidence as to both the Buffalo RFP and the Syracuse RFP, and the district court allowed admission of the evidence.

*DeMizio*, 741 F.3d 373, 384 (2d Cir. 2014). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (internal quotation marks omitted).

**B.      *The Right-to-Control Instruction***

Aiello and Kaloyeros contend that the district court's wire fraud instruction was erroneous because it permitted the jury to convict even if it found that Fort Schuyler received, and was intended to receive, the full economic benefit of its bargain. *See Binday*, 804 F.3d at 570 ("[W]e have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain.").

We reject this argument because the relevant instruction clearly explained the right-to-control theory. The jury charge began in relevant part by defining property to include "intangible interests such as the right to control the use of one's assets" and explaining that the right to control "is injured" when the victim "is deprived of potentially valuable economic information that it would consider valuable in deciding how to use its assets." App'x at 1554. It went on to define "potentially valuable economic information" as "information that affects

the victim's assessment of the benefits or burdens of a transaction, or relates to the quality of goods or services received or the economic risks of the transaction." App'x at 1554. Importantly, the charge then expressly cautioned that:

> If all the government proves is that the defendant caused Fort Schuyler to enter into an agreement it otherwise would not have, or caused Fort Schuyler to transact with a counterparty it otherwise would not have, without proving that Fort Schuyler was thereby exposed to tangible economic harm, then the government will not have met its burden of proof.

App'x at 1554-55.

The charge then explained "economic harm is not limited to monetary loss. Instead, tangible economic harm has been proven if the government has proven that the scheme, if successful, would have created an economic discrepancy between what Fort Schuyler reasonably anticipated it would receive and what it actually received." App'x at 1555. The charge defined "intent to defraud" to mean "act[ing] knowingly and with a specific intent to deceive, for the purpose of causing Fort Schuyler to enter into a transaction without potentially valuable economic information." App'x at 1555. The charge also explicitly provided that the government could not meet its burden by merely showing that the defendants caused Fort Schuyler to enter into an

agreement or transaction "without proving that Fort Schuyler was thereby exposed to tangible economic harm." App'x at 1554-55. The charge went on to define "tangible economic harm" as "an economic discrepancy between what Fort Schuyler reasonably anticipated it would receive and what it actually received." App'x at 1555.

Although this charge closely tracked the language set forth in our prior opinions, *see, e.g.*, *Finazzo*, 850 F.3d at 111; *Binday*, 804 F.3d at 570-71, Kaloyeros and Aiello nonetheless argue that the instructions were inadequate because they failed to explain that receiving the full benefit of a bargain is not wire fraud and they purportedly allowed for convictions "based on a merely hypothetical possibility of harm." Aiello Br. at 75. We see no merit to these arguments.

As indicated above, our cases have stressed time and again that "the Government need not prove 'that the victims of the fraud were actually injured,' but only 'that defendants contemplated some actual harm or injury to their victims.'" *Greenberg*, 835 F.3d at 306 (quoting *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006)); *accord Gatto*, 986 F.3d at 124; *Binday*, 804 F.3d at 569. Though defendants rely on *Binday*'s statement that our precedent has "repeatedly rejected

application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain," 804 F.3d at 570, *Binday*'s description of our cases did not undercut the rule that economic harm need only be contemplated. The cases *Binday* cited dealt with scenarios in which the victim faced no exposure to economic harm due to the fraud. *See id.* at 570 n.10; *id.* at 599 n.46. In fact, *Binday* expressly rejected nearly the same argument defendants raise here, underscoring that the "mail and wire fraud statutes do not require a showing that the contemplated harm actually materialized." *Id.* at 574; *see also id.* at 576 ("The indictment need not allege, and the government need not prove, that the specified harms had materialized for the particular policies at issue or were certain to materialize in the future."). Thus, there was no error, and certainly no harmful error, in the district court's right-to-control jury instruction.

## C.    *The No-Ultimate-Harm Instruction*

Kaloyeros also argues that the district court erred in instructing the jury on the good faith defense to wire fraud by including a no-ultimate-harm

instruction that, in his view, undermined both the court's good faith instruction and the instruction regarding the requisite intent necessary for conviction.

After explaining that " good faith on the part of a defendant is a complete defense to a charge of wire fraud," the district court went on to state:

> In considering whether a defendant acted in good faith, you are instructed that if a defendant knowingly and willfully participated in the scheme to deprive Fort Schuyler of potentially valuable economic information, a belief by the defendant that eventually everything would work out so that Fort Schuyler would get a good deal does not mean that the defendant acted in good faith.

App'x at 1555.

Kaloyeros argues that this "no ultimate harm" instruction fails to comply with our precedent in *United States v. Rossomando*, 144 F.3d 197, 200-03 (2d Cir. 1998). In *Rossomando*, we rejected the instruction that "[n]o amount of honest belief on the part of the defendant that the scheme would not ultimately result in a financial loss to the [victim] will excuse fraudulent actions or false representations by him," *id.* at 199, in a case where the defendant firefighter had underreported his post-retirement income on pension forms but claimed that he did not believe *any* harm would result, *id.* at 198. We have since clarified that *Rossomando* is "limited to the quite peculiar facts that compelled [its] result,"

*United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (internal quotation marks omitted), and explained that "a 'no ultimate harm' instruction given by the district court is proper where (1) there was sufficient factual predicate to necessitate the instruction, (2) the instruction required the jury to find intent to defraud to convict, and (3) there was no evidence that the instruction caused confusion," *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016).  The requisite predicate for such an instruction is present where there is evidence that a defendant intended an immediate cognizable harm, but he argues that there was no harm in the long run.  *See id*.

Here, the district court did not err in giving the no-ultimate-harm instruction.  The necessary factual predicate for the instruction was satisfied because there was evidence that the defendants intended immediate cognizable harm -- depriving Fort Schuyler of potentially valuable economic information in connection with the Buffalo Billion projects -- even though defendants argued at trial that ultimately the projects were a success and Fort Schuyler was not harmed.  *See, e.g.*, App'x at 1480 ("[W]hen the dust settled, Fort Schuyler got great contractors for important work at Riverbend, the IT center, the film hub, Soraa.").  Moreover, the instructions properly required the jury to find that fraud was

intended.  Finally, nothing in the record indicates that the instruction caused confusion; in fact, it clearly stated that "[a]n honest belief in the truth of the representations made by a defendant is a complete defense."  App'x at 1555.  Accordingly, we find no error in this instruction.

## III. *Evidentiary Rulings*

The defendants also challenge a pair of evidentiary rulings made by the district court during trial.  First, Kaloyeros, Aiello, and Gerardi argue that the district court denied them the right to present a defense by precluding evidence that the buildings constructed by COR Development and LPCiminelli were built "on time" and were of "high-quality," and that the fees charged were "reasonable."  *See* Kaloyeros Br. at 33, 35.  Second, Kaloyeros and Ciminelli argue that the district court should not have permitted witnesses from rival construction companies to testify regarding the prevailing range of construction management fees.

### A. *Applicable Law*

We review evidentiary rulings for abuse of discretion.  *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012).  "We will find an abuse of discretion only where the trial judge ruled in an arbitrary or irrational fashion."  *United*

*States v. Kelley*, 551 F.3d 171, 175 (2d Cir. 2009) (internal quotation marks omitted). Even when a district court's evidentiary ruling is "manifestly erroneous," however, the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). An evidentiary error is harmless if this Court determines with "fair assurance that the jury's judgment was not substantially swayed by the error." *United States v. Paulino*, 445 F.3d 211, 219 (2d Cir. 2006) (internal quotation marks omitted).

"The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment," *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001), as well as by the Due Process Clause of the Fifth Amendment, *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992). "The right is not, of course, unlimited; the defendant 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability.'" *Schriver*, 255 F.3d at 56 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 n.7 (1982) (noting that "the Sixth Amendment

does not guarantee criminal defendants the right to compel the attendance of any and all witnesses").

## B. Analysis

### 1. Quality-of-Construction Evidence

Prior to trial, the district court granted the government's motion to preclude the defense from offering evidence of the alleged merits or public benefits of the projects awarded to COR Development and LPCiminelli, concluding that the evidence was not relevant because "the defendants are accused of defrauding Fort Schuyler of the right to make a fully informed decision and not the right to a building that satisfied the terms of the development contracts." App'x at 1292.

Defendants argue that the district court should have admitted evidence regarding the quality of the construction project as evidence that Fort Schuyler obtained the benefit of its bargain. As already noted, however, the quality of defendants' construction projects was not the bargain compromised by defendants' fraudulent scheme, and it is not a defense to a right-to-control wire fraud that the product the victim was fraudulently induced into buying did not harm the victim or was generally a good product. Because this evidence was not

- 41 -

material, we conclude that the district court did not abuse its discretion in precluding it, and that its exclusion did not violate defendants' right to present a meaningful defense. *See Valenzuela-Bernal*, 458 U.S. at 867.

### 2. *Testimony Regarding Construction Management Fees*

Kaloyeros and Ciminelli also challenge the district court's evidentiary ruling allowing the government to elicit testimony from two witnesses employed by competing construction companies that were interested in bidding on the Buffalo RFP. On appeal, Kaloyeros and Ciminelli principally contend that it was unfairly prejudicial to them to admit this evidence while precluding evidence that Fort Schuyler ultimately received a good deal in its contracts with the defendants. *See* Fed. R. Evid. 403.

The challenged witnesses testified to the range of fees typically charged by other construction management companies in the market. This evidence, unlike the evidence that defendants sought to admit, was relevant under the right-to-control theory of wire fraud because it demonstrated that defendants contemplated economic harm by preventing Fort Schuyler from fairly considering bids in a marketplace where lower prices might have been available. The construction-fee evidence was relevant to the right-to-control

theory because, if there is a reasonable range of fees for projects generally, a factfinder could infer such a range for particular projects. While the witnesses did not specify what range of fees might be available for the particular projects COR Development and LPCiminelli actually undertook, defendants were able to -- and indeed did -- cross-examine the witnesses on this and other purported deficiencies, thereby avoiding prejudice. In these circumstances, the district court acted within its discretion in admitting the fee evidence.

## IV. *Gerardi's False Statements Conviction*

Finally, Gerardi argues that the district court erred in denying his motion to dismiss the false statements count for purported prosecutorial misconduct.[13] Such a dismissal, following a conviction, "is an extraordinary remedy," *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989) (internal quotation marks omitted), but "pursuant to [this court's] supervisory power," we "may dismiss an indictment for prosecutorial misconduct if the grand jury was misled or misinformed, or possibly if there is a history of prosecutorial

---

[13] Gerardi also argues that if his convictions for wire fraud conspiracy and wire fraud are overturned, he would be entitled to a new trial on his false statement conviction on account of "prejudicial spillover." Gerardi Appellant Br. at 49; *see also United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994). Because we find no basis for overturning Gerardi's wire fraud convictions, we do not reach this argument.

misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process," *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (internal quotation marks and citations omitted). We review the denial of a motion to dismiss for prosecutorial misconduct *de novo*. *United States v. Walters*, 910 F.3d 11, 22 (2d Cir. 2018).

Gerardi's claim of prosecutorial misconduct stems from the government's conduct during his June 21, 2016 proffer session that became the subject of his Count Sixteen conviction. He argues that the prosecutors misled him into thinking that he was not a target of the investigation before his proffer. Relying on *United States v. Jacobs* ("*Jacobs I*"), 531 F.2d 87 (2d Cir. 1976), he contends that this rose to the level of prosecutorial misconduct and warranted dismissal of the count. In *Jacobs I*, we affirmed the suppression of grand jury testimony, and the resultant dismissal of a perjury charge based on that testimony, where the government failed to warn the witness that he was a target of the investigation. *Id.* at 89-90. Notably, however, we subsequently clarified that *Jacobs I* was to be narrowly interpreted -- "a one-time sanction to encourage

- 44 -

uniformity of practice . . . between the Strike Force and the United States

Attorney." *United States v. Jacobs* ("*Jacobs II*"), 547 F.2d 772, 773 (2d Cir. 1976).

Although *Jacobs I* is relevant, it is not entirely on-point as it related to

a grand jury investigation and not to a pre-indictment proffer session.

Regardless, Gerardi's argument lacks merit because he had no right to lie in the

proffer session, and he does not have a constitutional right to a warning that he is

a target. *See United States v. Washington*, 431 U.S. 181, 189 (1977) ("It is firmly

settled that the prospect of being indicted does not entitle a witness to commit

perjury, and witnesses who are not grand jury targets are protected from

compulsory self-incrimination to the same extent as those who are. Because

target witness status neither enlarges nor diminishes the constitutional

protection against compelled self-incrimination, potential-defendant warnings

add nothing of value to protection of Fifth Amendment rights."); *United States v.*

*Remington*, 208 F.2d 567, 570 (2d Cir. 1953) (stating that "to call the perjury a fruit

of the government's conduct . . . is to assume that a defendant will perjure

himself in his defense" and identifying no cognizable "causal relation . . . between

the government's wrong and the defendant's act of perjury"); *see also United States*

*v. Babb*, 807 F.2d 272, 277, 279 (1st Cir. 1979) (rejecting contention that

prosecutor's representation, at defendant's grand jury appearance, that defendant was neither a target nor a subject "undermined the fundamental fairness of the proceedings" because "it defies logic to argue that assurances that might have lulled a witness into giving incriminating statements had the effect of inducing the witness to commit perjury").

Thus, even assuming that the government failed to warn Gerardi that he was a subject of an investigation during his proffer -- something the government disputes -- such a failure would not rise to the level of misconduct required to justify dismissal of the charge. Accordingly, the district court did not err in denying Gerardi's motion to dismiss his conviction for making a false statement.

*CONCLUSION*

For the reasons set forth above, the judgments of the district court are AFFIRMED.