**17-3514 (L)**
*United States v. Jabar*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2020

ARGUED: OCTOBER 14, 2020
DECIDED: NOVEMBER 19, 2021

Nos. 17-3514-cr (Lead), 18-1233-cr (XAP), 18-1857-cr (XAP)

UNITED STATES OF AMERICA,
*Appellant-Cross-Appellee*,

*v.*

STEVE S. JABAR, aka Steve Shariff, aka Satar Jabar, aka Kamal Jabar,
aka Kamal Jamel, DEBORAH BOWERS,
*Defendants-Appellees-Cross-Appellants*.

————

On Appeal from the United States District Court
for the Western District of New York.

————

Before: WALKER, SACK,[*] and MENASHI, *Circuit Judges.*

————

---

[*] Circuit Judge Ralph K. Winter, originally a member of this panel, died on December 8, 2020. Circuit Judge Robert D. Sack replaced Judge Winter on the panel for this appeal. *See* 2d Cir. IOP E(b).

The United States appeals from a post-verdict judgment of acquittal entered by the District Court for the Western District of New York (Lawrence J. Vilardo, *J.*) with respect to the convictions of defendants Steve S. Jabar and Deborah Bowers for wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. The government argues that a reasonable jury could infer that the defendants had an intent to defraud the United Nations when they diverted for personal use more than $65,000 of grant money awarded to their non-profit organization. Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence for the jury to convict on the wire fraud and related counts. Because the district court did not reach defendants' motion for a new trial on these counts, we remand for it to consider the motion in the first instance.

Jabar and Bowers also cross-appeal the district court's order denying their motions for a judgment of acquittal or a new trial on their convictions for making false statements, in violation of 18 U.S.C. § 1001. Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence for the jury to convict defendants for their false statements. We discern no errors with respect to the false statement convictions that would require a new trial.

Accordingly, we **REVERSE** the district court's judgment of acquittal on the wire fraud and wire fraud conspiracy counts; **AFFIRM** the district court's denial of a judgment of acquittal and a

new trial on the false statement counts; and **REMAND** with directions for the entry of judgment consistent with the foregoing and for consideration of the motion for a new trial on the wire fraud and wire fraud conspiracy counts.

————

Tiffany H. Lee, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, *for Appellant-Cross-Appellee*.

Jamesa J. Drake, Drake Law, LLC, *for Defendant-Appellee-Cross-Appellant Steve S. Jabar*.

Mark J. Mahoney (Jesse C. Pyle, *on the brief*), Harrington & Mahoney, *for Defendant-Appellee-Cross-Appellant Deborah Bowers*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

The United States appeals from a post-verdict judgment of acquittal entered by the District Court for the Western District of New York (Lawrence J. Vilardo, *J.*) with respect to the convictions of defendants Steve S. Jabar and Deborah Bowers for wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in

violation of 18 U.S.C. § 371.  The government argues that a reasonable jury could infer that the defendants had an intent to defraud the United Nations (UN) when they diverted for personal use more than $65,000 of grant money awarded to their non-profit organization. Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence for the jury to convict on the wire fraud and related counts.  Because the district court did not reach defendants' motion for a new trial on these counts, we remand for it to consider the motion in the first instance.

Jabar and Bowers also cross-appeal the district court's order denying their motions for a judgment of acquittal or a new trial on their convictions for making false statements, in violation of 18 U.S.C. § 1001.  Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence for the jury to convict defendants for their false statements.  We discern no errors with respect to the false statement convictions that would require a new trial.

Accordingly, we **REVERSE** the district court's judgment of acquittal on the wire fraud and wire fraud conspiracy counts; **AFFIRM** the district court's denial of a judgment of acquittal and a new trial on the false statement counts; and **REMAND** with directions for the entry of judgment consistent with the foregoing and for consideration of the motion for a new trial on the wire fraud and wire fraud conspiracy counts.

### BACKGROUND

This case arises from defendants' personal use of grant money that the UN awarded to their non-profit organization, Opportunities for Kids International, Inc. (OKI). Jabar and Bowers applied for and obtained a grant in the amount of $500,000 ($150,000 of which was later withheld) for the sole purpose of establishing a radio station in Iraq dedicated to women's programming. Instead, the defendants siphoned off more than $65,000 of the grant to pay personal debts, bills, and taxes.

The following background draws the facts from the trial evidence and describes them in the light most favorable to the government, as we must in reviewing a post-verdict motion for a judgment of acquittal.[1] Unless otherwise noted, the parties do not dispute the relevant facts.

The UN's Grant Application Process

The UN is a well-known international organization of 193 member states based in New York City that engages in diplomatic and donor-state-driven endeavors. The efficacy of the UN generally, ever the subject of debate, has no bearing on this case. The United Nations Development Fund for Women (UNIFEM) is a UN agency that fosters gender equality, including by providing grants to non-governmental organizations (NGOs). UNIFEM requires an NGO that is interested in a grant to submit a proposal describing the project, the

---

[1] *United States v. Litwok*, 678 F.3d 208, 210-11 (2d Cir. 2012).

organization receiving the grant, and the projected budget. If the project is approved, the NGO and UNIFEM enter into a standard cooperation agreement that sets forth conditions governing the use and management of the grant money.

UNIFEM grants are funded entirely through voluntary donations by UN member states. As a condition for obtaining the grant, UNIFEM requires grant recipients to maintain and submit detailed records of their expenditures to show that the grant is being spent in furtherance of UNIFEM's mandate.

The Charged Fraudulent Scheme

In 1995, Jabar and Bowers originally founded OKI as a not-for-profit organization to provide monetary, immigration, and educational assistance to Kurdish refugees in upstate New York. Bowers served as OKI's Executive Director and Jabar served as its Treasurer.

By 2003, Jabar had amassed hundreds of thousands of dollars of personal debt. To ease his financial difficulties, in November 2003, Jabar, with Bowers's assistance, applied for a loan that would consolidate $350,000 worth of mortgage payments, back taxes, consumer debts, bank loans, and other debts. The loan was refused. Thereafter, Jabar borrowed money from friends, including approximately $45,000 from Bassam Bitar and $23,000 from Saad Almizoori.

In June 2004, Jabar and Bowers applied on behalf of OKI for a UNIFEM grant to establish a radio station in Iraq named Voice of Women (VOW), which would broadcast programming to educate Iraqi women on democratic processes and increase civic engagement. Jabar and Bowers initially requested $423,000 in seed money, before increasing their request to $500,474. To substantiate the budget request, they submitted a line-item budget that explained how each dollar would be allocated towards the radio station.

On December 12 and 13, 2004, OKI and UNIFEM, respectively, formalized the terms of the grant in a Project Cooperation Agreement (Cooperation Agreement). The Cooperation Agreement's preamble pronounced, "UNIFEM has been entrusted by its donors with certain resources that can be allocated for programmes and projects, and is accountable to its donors and to its Executive Board for the proper management of these funds."[2] The Cooperation Agreement then set forth detailed terms regulating the spending, recordkeeping, and reporting of the grant funds.

UNIFEM would disburse the grant in multiple installments: an initial disbursement of $350,000 and subsequent installments on a quarterly basis. OKI was to use the funds "in strict accordance" with a so-called Project Document, which purported to list the objectives of the endeavor.[3] Expenditures were not to exceed a 20 percent variation from any line item of the Project Budget unless OKI

---

[2] Joint App'x 2087.
[3] Joint App'x 2092, art. VIII, ¶ 2.

obtained UNIFEM's advance approval. OKI was required to return to UNIFEM any funds not spent on the project within two months of the termination of the agreement or completion of the project. The government did not introduce either the Project Document or the Project Budget into evidence at trial.

The Cooperation Agreement additionally imposed detailed recordkeeping and reporting requirements. OKI agreed to maintain accurate and updated records of all expenditures "to ensure that all expenditures are in conformity with the provisions of the Project Work Plan and Project Budgets."[4] Such records were to include original invoices, bills, and receipts. Every quarter, OKI was to transmit to UNIFEM a financial report listing the disbursements incurred on the project. Only if the financial report showed the "satisfactory management and use of UNIFEM resources" would UNIFEM release the remainder of the grant.[5] OKI also agreed to at least one audit "on the status of funds advanced by UNIFEM" during the project.[6]

When Jabar signed the Cooperation Agreement on behalf of OKI, OKI's bank balance was $1,630.96. On December 15, OKI received the initial $350,000 disbursement. The next day, Bowers wrote a check for $20,000 to Bitar, one of Jabar's friends who had loaned him money for his personal expenses. One week later, on

---

[4] Joint App'x 2092, art. IX, ¶ 1.
[5] Joint App'x 2092, art. VIII, ¶ 1.
[6] Joint App'x 2093, art. XI, ¶ 1.

December 23, Bowers wired $10,000 to Almizoori, another friend of Jabar's who had loaned him money.

Over the next six months, Jabar and Bowers continued to withdraw money from OKI's grant-infused bank account for personal use. On February 17, 2005, Bowers wired $1,500 to pay for a family friend's medication. On March 3, Bowers wrote herself $7,362.54 check to repay $8,000 that she had loaned Jabar. On April 14, Bowers wrote Jabar a check for $7,219 bearing the memo "VOW Radio." That same day, she wrote a check from Jabar's account for an identical sum to pay his property taxes. On May 1, Bowers wrote a $5,600 check to Jabar with the memo "general manager" and deposited it in his personal account. She then used that money to pay his mortgage, premiums, credit cards, utility bills, medical bills, and insurance. On June 3, Bowers wired $10,000 from OKI's account to Jabar's personal account to cover a prior $10,000 check Jabar had written to Bitar for "payment/loan." On June 8, Bowers transferred $15,000 from OKI's account to her personal account. On June 20, Bowers transferred $4,200 from OKI's account to Jabar's personal account to pay loans, credit cards, and utility bills. In total, the government asserted that defendants withdrew more than $65,000 from the OKI account to pay personal expenses.

On May 9, 2005, more than one month beyond the quarterly report deadline, the defendants submitted a financial report showing $357,259 in expenditures and receipts showing $362,918 in VOW-related expenses. The report failed to account for numerous expenditures made using the grant. It claimed that OKI made its first

expenditure on January 1, 2005, even though Bowers had transferred $20,000 to Bitar and $10,000 to Almizoori on December 15 and December 23, 2004, respectively. The report did not disclose any of the personal expenditure payments Jabar or Bowers made.

UNIFEM opened an investigation and audit over concerns that OKI's report showed unauthorized expenditures and inadequate receipts. Based on the audit's results, UNIFEM did not release the remaining $150,000 of the grant. OKI ultimately built a radio station, but the parties dispute whether it met the project specifications.

In June 2005, the Internal Revenue Service (IRS) received multiple suspicious activity reports that flagged attempted transfers from OKI's bank account to bank accounts in the Middle East. The IRS began an investigation led by Special Agent Michael Klimczak. In July 2006, Agent Klimczak interviewed Bowers in her home regarding the UN grant. Bowers initially told the agent that all $350,000 went towards VOW. When Agent Klimczak showed her copies of checks and wire transfers, however, she admitted the personal use payments. As an example, she initially claimed that the March 3, 2005 check for $7,219 went towards VOW but, upon being confronted with certain records, she admitted that she withdrew that grant money to pay Jabar's property taxes.

In September 2006, Agent Klimczak interviewed Jabar. Jabar initially told the agent that he had transferred all $350,000 to Iraq to spend on VOW, save $10,000 set aside for legal and other expenses. Upon being shown records of certain transactions, however, he

admitted to repaying his personal debts with grant money. For example, he admitted to transferring money to Bitar and Almizoori to repay loans to renovate his properties, to pay property taxes, and to make credit card payments. He conceded that "he knew that wasn't the way to operate" but he did not want to "embarrass himself" before his friends.[7] He also admitted to using grant money "to keep the IRS people off his back."[8]

As Agent Klimczak continued showing records of personal expenditures from the OKI account, Jabar became upset. He stated, "[S]orry, big mistake, I'm going to get crucified for that," when shown the $7,219 check bearing the false memo, "VOW Radio."[9] He also exclaimed, "[T]his is life, you borrow money, and you pay it back. I needed the money. I didn't care where it came from. I needed to pay Bitar, bills, loans. I wasn't making millions out of [the Department of Homeland Security]."[10]

Procedural History

On May 21, 2009, the grand jury returned a fourteen-count indictment charging Jabar and Bowers with conspiracy to commit wire fraud (Count 1), wire fraud (Counts 2-4), money laundering (Counts 5-9), and false statements (Counts 10-14). At trial, the government's evidence included the Cooperation Agreement,

---

[7] Joint App'x 2186.
[8] Joint App'x 2176.
[9] Joint App'x 2175-76.
[10] Joint App'x 2191.

records showing in excess of $65,000 in personal expenditures, testimony by friends of Jabar concerning his debts, and testimony by Agent Klimczak.

The defense produced accountant and expert witness Eric Colca, who testified that OKI had spent $357,361 on the VOW project by March 2005 and thus satisfied its obligation to spend $350,000 on the radio station. Colca calculated OKI's expenditures by totaling four categories of transactions that he assumed, based on Jabar's representations, were related to VOW: (1) transfers from the OKI account to a Jordanian bank account; (2) transfers from Jabar's personal account to the Jordanian account; (3) third-party loans for which Jabar purportedly assumed responsibility; and (4) invoices and receipts showing construction and operation expenses. From that total, Colca subtracted withdrawals from OKI's account that were unrelated to the radio station to arrive at total VOW expenditures. On cross-examination, Colca acknowledged that he did not conduct an audit and thus assumed without confirming, for example, that all $250,000 transferred from OKI's account to the Jordanian account was spent on the radio station. Colca also admitted to possibly double counting certain expenditures.

Following the five-week trial, the jury returned guilty verdicts against the defendants on wire fraud (Count 4), conspiracy to commit wire fraud (Count 1), and making false statements (Count 14 for Jabar; Counts 11-13 for Bowers). As to these counts, Jabar and Bowers jointly moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of

Criminal Procedure 33.  The district court granted a judgment of acquittal on the wire fraud and conspiracy to commit wire fraud counts, dismissed the new trial motion on the wire fraud and conspiracy counts as moot, and upheld the false statement convictions.[11]  The district court imposed sentences of one day of time served and fines of $500 as to both defendants.  This appeal followed.

## DISCUSSION

The government appeals from the judgment of acquittal on the wire fraud and related counts.  The government argues that the district court erred by concluding that there was insufficient evidence of fraudulent intent.  As to those counts, Jabar and Bowers argue that the district court correctly entered the judgment of acquittal and, in the alternative, that a new trial is warranted based on various evidentiary rulings and the jury instructions.  On cross-appeal, Jabar and Bowers challenge the district court's denial of their motions for a judgment of acquittal or a new trial on the false statement counts.

---

[11] *United States v. Jabar*, No. 09-CR-170, 2017 WL 4276652, at *1 (W.D.N.Y. Sept. 27, 2017).

## I.      Wire Fraud and Conspiracy to Commit Wire Fraud

### A. Sufficiency of the Evidence

We review *de novo* the district court's grant of a motion for a judgment of acquittal under Rule 29.[12]  Only if "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" may the court enter a judgment of acquittal.[13]  "[W]e must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."[14]  Here, the defendant "faces a heavy burden."[15]  As long as the evidence "[would] suffice to convince any rational trier of fact that the crime charged has been proven beyond a reasonable doubt, then the conviction must stand."[16]

In reviewing the evidence on a motion for a judgment of acquittal, the court must be careful not to usurp the role of the jury. "Rule 29[] does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and

---

[12] *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012).

[13] *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

[14] *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quotation marks omitted).

[15] *United States v. Novak*, 443 F.3d 150, 157 (2d Cir. 2006) (quotation marks omitted).

[16] *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

the reasonable inferences to be drawn for that of the jury."[17]  Thus, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."[18]

The elements of wire fraud are:  "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme."[19]  Conspiracy to commit wire fraud requires merely the agreement between defendants to engage in the foregoing and an overt act by one of the conspirators in furtherance of the conspiracy.[20]

"Essential to a scheme to defraud is fraudulent intent."[21]  Fraudulent intent may be inferred "[w]hen the 'necessary result' of the actor's scheme is to injure others."[22]  Intent may also be proven "through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false."[23]  Because an intent to deceive alone is insufficient to sustain a wire fraud conviction, "[m]isrepresentations amounting only to a deceit . . . must be coupled

---

[17] *Guadagna*, 183 F.3d at 129 (quotation marks omitted).

[18] *Id.*

[19] *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015); *see* 18 U.S.C. § 1343.

[20] 18 U.S.C. § 371.

[21] *D'Amato*, 39 F.3d at 1257.

[22] *Id.* (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970)).

[23] *Guadagna*, 183 F.3d at 129.

with a contemplated harm to the victim."[24]  "Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."[25] Proof of actual injury to the victim is not required because the scheme need not have been successful or completed.[26]

Comparing two of our previous decisions clarifies that the misrepresentations must be central, not just collateral, to the bargain between the defendant and the victim.  In *United States v. Starr*, owners of a bulk mailing company schemed to conceal higher rate mailings from customers in lower rate bulk mailings without paying the additional postage to the postal service or refunding their customers' excess postage payments.[27]  Defendants "represented that funds deposited with them would be used only to pay for their customers' postage fees," but upon defrauding the postal service, defendants sent fraudulent receipts to their customers and appropriated the remainder of the funds for their own use.[28]  We concluded that because the customers' mail was delivered on time to the correct location, whatever harm there was did not "affect the very nature of the bargain itself."[29]  At most, the government's evidence

---

[24] *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).

[25] *Id.* (quotation marks omitted).

[26] *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996).

[27] 816 F.2d at 95.

[28] *Id.* at 99.

[29] *Id.* at 98.

showed defendants' intent to deceive or induce customers into the transaction but not a fraudulent intent.[30]

In *United States v. Schwartz* the defendants schemed to purchase U.S.-manufactured military equipment for their international clients.[31]   One producer, Litton Industries, "expressly demanded assurances" that its devices would not be exported unlawfully, including that:  the condition be incorporated into the sales agreement, the defendants disclose the customer's identity, and the customer obtain the requisite export certificates.[32]   Rather than comply, the defendants fed Litton false information and fabricated documents to secure the purchase.[33]   On appeal, we concluded that evidence of the defendants' deceitful acts supported a finding of fraudulent intent and thus upheld the wire fraud convictions.  We distinguished these facts from the false representations in *Starr*, which "did not cause any discrepancy between benefits reasonably anticipated and actual benefits received" and, therefore, "did not go to an essential element of the bargain."[34]   The scheme in *Starr* "only defeated [defendants'] customers' expectation that the money they paid to the defendants would be fully used to pay for postage, an expectation *that was not the basis of the bargain*."[35]   To the contrary, the defendants' misrepresentations in *Schwartz* were not "simply

---

[30] *Id.* at 100.

[31] 924 F.2d 410, 414 (2d Cir. 1991).

[32] *Id.* at 421.

[33] *Id.*

[34] *Id.* at 420.

[35] *Id.* (emphasis added).

fraudulent inducements," but went to an essential element of the bargain: the *lawful* export of military equipment.[36] The defendants made "*explicit* promises . . . in response to Litton's demands" and evidence showed that the deceived party "would not have sold its product" to defendants if they "had not been able to guarantee these conditions."[37] Therefore, even though it received payment, Litton was deprived of "the right to define the terms for the sale of its property" and "good will because equipment [that] Litton, a government contractor, sold was exported illegally."[38] The wire fraud statute captured these non-pecuniary harms.[39]

Bearing these principles in mind, we consider the nature of the instant transaction between the parties and the government's evidence of fraudulent intent.

### i. Nature of the Transaction Between the Parties

The district court ultimately concluded that the evidence was insufficient to prove that the defendants had the intent to defraud the UN because ultimately, they built "$350,000 worth of a radio station."[40] In reaching this decision, the district court rejected the notion that a reasonable jury could find Jabar and Bowers's use of

---

[36] *Id.* at 421.

[37] *Id.* at 420-21.

[38] *Id.* at 421.

[39] *Id.*; *see also United States v. Peroco*, 13 F.4th 158, 172 (2d Cir. 2021) (depriving a party of an "essential element of the bargain . . . is plainly sufficient for a wire fraud conviction under our caselaw").

[40] *Jabar*, 2017 WL 4276652, at *5.

grant funds for personal expenses was itself a harm to the UN.[41]  We do not agree that the evidence compels a finding that the benefit of the bargain to UNIFEM was confined to a brick-and-mortar radio station.   The evidence was sufficient for the jury to determine reasonably that OKI's representation in the Cooperation Agreement that it would spend the grant funds pursuant to UNIFEM's specifications was equally essential to the issuance of the grant.

The Cooperation Agreement required compliance with numerous spending provisions that controlled OKI's use of the $500,000.  OKI agreed to "utilize the funds . . . provided by UNIFEM in strict accordance with the Project Document."[42]   Although the government failed to offer the Project Document and Project Budget into evidence, a reasonable jury could rely on other evidence that *was* offered to infer that a restriction on the use of grant funds was part of the basis of the bargain.  The defendants' own budget proposal, received in evidence, unsurprisingly stated that every dollar of the grant proceeds would be allocated to a VOW-related expense.  And a UNIFEM official testified that the agency as a matter of course demands assurances from grant recipients that they will devote the awarded money exclusively towards the project.  The Cooperation Agreement also required that Jabar and Bowers return to UNIFEM

---

[41] *Id.* at *6 (recognizing that evidence "may have been sufficient to show that the defendants intended to use UN money dollar-for-dollar not on the radio station but on personal expenses," but determining this was distinct from "intending to harm the UN by not giving the UN the benefit of its bargain").

[42] Joint App'x 2092, art. VIII, ¶ 2.

any funds not spent on the project. UNIFEM mandated the return of all unused funds precisely because the proper use and management of funds was central to the bargain.

The Cooperation Agreement contained exhaustive accounting requirements that also demonstrate that OKI's proper spending of the grant was essential to the bargain. The agreement required OKI to "keep accurate and up-to-date records and documents in respect of all expenditures"[43] and maintain "original invoices, bills, and receipts."[44] UNIFEM explained the purpose of the records clearly: so that UNIFEM could "ensure that all expenditures are in conformity with the provisions of the Project Work Plan and Project Budgets."[45] Moreover, OKI was required to disclose all income and expenditures in financial reports, "[t]he purpose of [which was] to request a quarterly advance of funds."[46] UNIFEM would disburse each subsequent grant installment only upon determining that the report "show[ed] satisfactory management and proper use of UNIFEM resources."[47] As in *Schwartz*, UNIFEM "made explicit" these requirements by "expressly demand[ing] assurances from" the defendants in the terms of the Cooperation Agreement.[48]

---

[43] Joint App'x 2092, art. IX, ¶ 1; *see also* Joint App'x 2091, art. VII, ¶ 7 ("[OKI] shall maintain complete and accurate records of equipment, supplies and other property purchased with UNIFEM funds.").

[44] Joint App'x 2092, art. IX, ¶ 1

[45] *Id.*

[46] Joint App'x 2093, art. X, ¶ 2(b).

[47] Joint App'x 2092, art. VIII, ¶ 1.

[48] *Schwartz*, 924 F.2d at 420-21.

The spending and accounting conditions are reinforced by the Cooperation Agreement's precatory language describing UNIFEM'S duty and accountability to its donors and testimony from a UNIFEM official. Because grants are funded exclusively by donor countries, a UNIFEM official made clear that "there has to be assurance, continuous assurance available with the [UN] that the money is being spent for the purpose for which it has been given . . . ."[49]

In sum, the government's theory at trial was that the construction of the radio station was only part of the bargain and that it served to conceal defendants' fraudulent acts with respect to the rest of the bargain[50]—OKI's agreement to spend the entirety of the grant exclusively pursuant to the terms of the Cooperation Agreement. To the extent defendants insisted that the contractual bargain was confined to building the radio station, the jury was free to reject that claim based on its assessment of the weight of the evidence and reasonable inferences it could draw from that evidence.

---

[49] Joint App'x 176-77.

[50] The indictment charged: "in order to conceal and promote their criminal conspiracy and wire fraud scheme, the defendants undertook *certain measures designed to demonstrate apparent compliance with the UNIFEM Agreement, including . . . establishing 'Voice of Women Radio.'"* Joint App'x 65 (emphasis added). The bargain, as set forth in the indictment, was "that all [grant] money would be acquired and used by . . . OKI for the purpose of establishing and running a radio station," pursuant "to the terms and conditions set forth in the UNIFEM Agreement." Joint App'x 64-65.

> ## ii.    *Evidence of Jabar and Bowers's Fraudulent Intent*

The district court concluded that the government's proof at most showed that Jabar and Bowers comingled the UN grant with their personal funds because they used "other fungible dollars to build the radio station for which the UN money was given."[51]  We disagree.  Based on the record, we conclude that there was sufficient evidence to support the government's theory of fraudulent intent: that from the outset the defendants never intended to use the entirety of the $500,000 grant or the $350,000 that they actually received on VOW, but rather they intended to divert a portion for their personal use, either as "free money" or as a loan.

Viewing the evidence in the light most favorable to the government, we conclude a reasonable jury could find that the necessary result of a scheme to take the grant money for personal use would harm the UN.  By diverting a portion of the grant for purposes not authorized under the Cooperation Agreement and unrelated to VOW, the scheme would necessarily deprive UNIFEM of money or property while also depriving it of the proper management and documentation of contributions entrusted by donor countries to UNIFEM's care.

The evidence from which the jury could infer a fraudulent intent included:  (1) bank records showing that Jabar and Bowers withdrew and transferred more than $65,000 from the OKI bank account for personal use; (2) Jabar's financial motive to defraud the

---

[51] *Jabar*, 2017 WL 4276652, at *6.

UN; (3) the defendants' immediate use of the grant money to repay Jabar's debts; (4) Jabar's statement to Agent Klimczak that he needed money; and (5) the defendants' initial false statements to Agent Klimczak that they spent the grant only on the project.

First, the government introduced bank records showing that Jabar and Bowers diverted more than $65,000 from the OKI bank account for their personal use. The evidence that the defendants made these unauthorized expenditures from the grant supports a strong inference that they intended to harm the UN by depriving it of the right to define the terms for use of grant funds. None of these funds independently came from OKI because OKI started with a negligible bank balance of only $1,630.96 prior to receiving the grant funds.

Second, the evidence demonstrated Jabar's motive to get easy cash, and quickly. His friends testified that he owed them tens of thousands of dollars. Bitar confirmed that, when Jabar and Bowers applied for the grant, Jabar "was in a bad financial situation"[52] and had asked to borrow money with such frequency—"two, three times a month"—that Bitar began recording the loans.[53] The jury could also consider Jabar's unsuccessful personal loan application, which the mortgage broker declined to even submit to potential lenders. The timing of the application process–shortly before the defendants

---

[52] Joint App'x 369.
[53] Joint App'x 370.

sought the UN grant–further supports Jabar's urgency for financial relief.

Third, Jabar, with Bowers's assistance, used the grant money to pay back his creditor friends immediately in December 2004, a fact that they concealed from UNIFEM. One day after the initial installment was credited to OKI's bank account, Bowers withdrew $20,000 to repay Bitar. One week later, she transferred $10,000 to repay Almizoori. A reasonable jury could view the timing and the nature of these transactions, when considered alongside the motive evidence, as revealing the defendants' true aim in obtaining the grant, as the government contended.

Fourth, Jabar admitted that his financial difficulties drove him to use the UN-issued funds for personal purposes. In explaining those personal expenditures to Agent Klimczak, he stated, "[T]his is life, you borrow money, and you pay it back. I needed the money. I didn't care where it came from. I needed to pay Bitar, bills, loans. I wasn't making millions out of DHS."[54] That statement could reasonably be understood by the jury to reveal Jabar's intentions when he applied for and received the grant: the grant was a solution to his mounting indebtedness.[55]

_____

[54] Joint App'x 2191.

[55] The district court reached the same conclusion regarding this statement. *See Jabar*, 2017 WL 4276652, at *7 (describing statement as evidence that defendants "intended to use UN grant money and other

Fifth, the defendants' false statements support the inference that they understood their conduct to deprive the UN of benefits that it anticipated. Bowers wrote "VOW Radio" in the memo line of a check, even though she used the money to pay Jabar's property taxes; and Bowers and Jabar lied to Agent Klimczak that the entire grant was spent on OKI only to admit to the contrary after being confronted with the records. These misrepresentations when coupled with intended harm to UNIFEM were sufficient to allow the jury to find fraudulent intent.

Jabar and Bowers do not dispute that they took UN dollars in the OKI account to fund personal expenditures. Rather, they argue that the government failed to carry its burden to disprove that they may have made VOW-related transactions using other banks accounts. This reasoning suffers from three flaws: it elides the distinction between an intent to harm and actual harm; it asks the court to review the evidence in the light most favorable to the defense—the inverse of the standard of review on a Rule 29 motion; and—once "harm" is properly understood—the concession that they personally used funds in the OKI account is itself an admission of harm.

---

dollars to pay back Jabar's personal debts"). However, the district court wrongly determined that no reasonable jury could find that evidence of Jabar and Bowers's intent to violate the agreement in this manner supported a finding of fraudulent intent.

First, we emphasize that intent to defraud, an essential element of wire fraud, includes *contemplated* harm.[56]  The government was not required to prove that Jabar and Bowers actually harmed the UN by failing to replace money that they diverted from the grant or by failing to build a radio station.

Second, "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence" and to assess the weight of the evidence.[57]  On a motion for a judgment of acquittal pursuant to Rule 29, the court must view the case in the light most favorable to the government and defer to the jury's assessment of the evidence and its reasonable inferences drawn from that evidence.

Applying that deferential standard, we emphasize that the jury was not required to accept either the defendants' expert testimony that defendants spent more than $350,000 on the project by the end of March 2005 or the veracity of OKI's quarterly financial report.  And there were many reasons why a jury might discount or reject that evidence.  The government on cross-examination elicited several flaws in the methodology that defendants' expert witness Colca used.  Colca did not conduct an audit.  Instead, he "accepted the representations of Mr. Jabar regarding monies that he spent on the

---

[56] *See Peroco*, 13 F.4th at 176 (collecting cases).

[57] *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *Jackson*, 335 F.3d at 180).

radio station."[58]  Similarly, Colca assumed, without confirming, that $250,000 transferred from OKI's bank account to the Jordanian bank account was for VOW-related expenditures.[59]  He also acknowledged that his methodology, which separately tallied transfers to the Jordanian account, third-party loans, and invoices and receipts, could result in double counting radio-associated expenditures.  Finally, Colca did not confirm that the invoices and receipts were paid.  Presented with the above evidence, it was not unreasonable for the jury to discount Colca's testimony or reject it altogether.

The jury also was entitled to discount OKI's quarterly financial report, which showed $357,259 in expenditures, and receipts totaling $362,918.  The jury heard testimony that the report appeared to reflect unauthorized expenditures and lack adequate receipts.  Moreover, after an investigation and audit following the report, UNIFEM refused to disburse the rest of the grant.  A reasonable jury could certainly infer that OKI's report and receipts were fatally defective and that the misrepresentations the report contained, together with evidence of contemplated harm to the UN, could support a finding of fraudulent intent.

Third, in making their counterarguments, Jabar and Bowers do not dispute that they took UN dollars in the OKI account to fund personal expenditures.  In doing so, they seem wrongly to presume that those actions themselves did not cause harm to the UN.  Jabar

---

[58] Joint App'x 1605.

[59] Joint App'x 1595 ("[W]e assumed that once it got to that account, that it was going to the radio station.  That's as far as we could trace it.").

and Bowers ignore the possibility that restrictions on the use of funds were an essential element of their bargain with the UN, such that their intentional use of UN dollars on personal expenditure would harm the UN even if they paid back every penny and followed through on other aspects of the agreements.

For the above reasons, we conclude that the evidence was sufficient for a jury to find guilt beyond a reasonable doubt on the wire fraud and related conspiracy counts.[60]

## B. Motion for a New Trial

Federal Rule of Criminal Procedure 29(d) directs the district court, upon entering a judgment of acquittal after a guilty verdict, to "conditionally determine whether any motion for a new trial should also be granted if the judgment of acquittal is vacated or reversed," and to "specify the reasons for that determination."[61]  A conditional ruling on a motion for a new trial enables the appeals court to review

---

[60] The theory that the UN was deprived of the benefit of the bargain was charged in the indictment, presented to the jury, and responded to by the defense.  The closely related theory that the UN was denied the "right to control" its assets because defendants misrepresented "potentially valuable economic information" was not explicitly articulated at trial. *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019).  That the jury was not charged on a right to control theory does not alter our conclusions.  That is because liability under either theory turns on the materiality of the misrepresentations and requires us to consider whether the alleged deception "affect[ed] the very nature of the bargain."  *United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 687 (2020).

[61] Fed. R. Crim. P. 29(d)(1).

efficiently the judgment of acquittal and the decision on a new trial "in a single, consolidated appeal."[62]

After the jury verdict, Jabar and Bowers timely moved for both a judgment of acquittal and a new trial. Upon granting judgment of acquittal on the fraud and conspiracy convictions, however, the district court did not issue a conditional ruling on the defendants' motion for a new trial in accordance with Rule 29(d).[63] Neither party on appeal challenges the district court's failure to enter the conditional ruling under Rule 29(d), but the motion for a new trial was made below, and given our disposition, is no longer moot. Consideration of a motion for a new trial is a matter best reserved to the district court's informed discretion.[64] Accordingly, we remand to the district court for its determination of defendants' motion for a new trial. We express no opinion on whether the motion should be granted or denied.

---

[62] Richard Sauber & Michael Waldman, Unlimited Power: Rule 29(a) and the Unreviewability of Directed Judgments of Acquittal, 44 *Am. U. L. Rev.* 433, 438 (1994).

[63] The district court mistakenly concluded that, "[b]ecause the fraud and conspiracy counts have been dismissed, the defendants' motion for a new trial on those counts is moot." *Jabar*, 2017 WL 4276652, at *13 n.13.

[64] *See United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020); *United States v. Millender*, 970 F.3d 523, 531-32 (4th Cir. 2020) (remanding for district court to consider whether to grant a new trial and to "specifically explain the rationale for the decision").

## II.    False Statements

### A. Motion to Suppress Jabar's Statements to the IRS

Jabar challenges the district court's failure to suppress statements that he made during his interview with Agent Klimczak on the basis that it was a custodial interrogation that trigged safeguards under *Miranda v. Arizona*, which were not provided.[65] The district court determined to the contrary that Jabar was not in custody. "We review the district court's factual findings on the existence of a custodial interrogation for clear error, and its legal conclusions *de novo*."[66] To determine if a person was in custody, we first focus on whether the person was "free to leave."[67] We next consider whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."[68] "Relevant considerations include: (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion."[69]

---

[65] 384 U.S. 436 (1966).

[66] *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017).

[67] *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004).

[68] *Id.*

[69] *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quotation marks omitted).

We are satisfied that Jabar was not in custody. At the time of the interview, Jabar worked at DHS in Baghdad, and Agent Klimczak coordinated his videoconference interview through a Baghdad-based Federal Bureau of Investigations (FBI) officer. The FBI agent requested, but did not require, Jabar to attend, and he escorted Jabar to the interview without the use of any restraints, weapons, or force. Because the interview took place in the Baghdad Operations Center (BOC), a secure FBI facility, Jabar's movement within the BOC premises was necessarily restricted due to general security needs. Jabar does not contend, however, that he was prevented from leaving the interview. There is no suggestion that, at any point, Jabar attempted to terminate the interview or was prevented from doing so. Also, he was informed that he could take a break at any time and was offered refreshments. We believe these facts would not lead a reasonable person in Jabar's position to conclude that he was in custody. We thus affirm the district court's order denying the motion to suppress.

## B. Sufficiency of the Evidence

Bowers appeals her convictions for falsely stating to Agent Klimczak that she made three transactions to further the radio station project: (1) the April 14, 2005 check to Jabar for $7,219 bearing the memo, "VOW Radio"; (2) a $10,000 wire transfer to Jabar's personal account; and (3) the $4,200 wire transfer on June 20, 2005 to Jabar's personal account. She contends that the statements were not material and that the government failed to establish that she intended to deceive Agent Klimczak. Jabar challenges his conviction for falsely

stating to Agent Klimczak that the entire grant was transferred to Iraq for the purpose of the radio station on the grounds that his statement was not material.

To prove a false statement under 18 U.S.C. § 1001, the government must show that the defendant: "(i) knowingly and willfully, (ii) made a statement, (iii) in relation to a matter within the jurisdiction of a department or agency of the United States, (iv) with knowledge that it was false or fictitious and fraudulent."[70] A statement is material under § 1001 "if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed, or if it is capable of distracting government investigators' attention away from a critical matter."[71]

We find no merit to the defendants' claim that their statements were not material because Agent Klimczak already knew the answers to his questions, and he testified that their responses would not have changed his investigation. The jury could reasonably conclude that Jabar's and Bowers's explanation for whether they properly used the grant was "capable of influencing" the investigation, which is all that was required.[72]

---

[70] *United States v. Banki*, 685 F.3d 99, 117 (2d Cir. 2012), *as amended* (Feb. 22, 2012) (quoting *United States v. Wiener*, 96 F.3d 35, 37 (2d Cir. 1996)).

[71] *United States v. Adekanbi*, 675 F.3d 178, 182 (2d Cir. 2012) (quotation marks omitted).

[72] *Id.*

Bowers also argues that she did not have an intent to deceive because she was cooperative, misremembered the transactions, and corrected herself when informed of inaccuracies in her responses to Agent Klimczak.  We easily conclude that these fact issues fall within the purview of the jury,[73] which was free to reject or discount her argument at trial.  Finally, that Bowers subsequently admitted to each false statement is not a basis for setting aside the jury's verdict, because "there is no safe harbor for recantation or correction of a prior false statement that violates section 1001."[74]  For the above reasons, we conclude that there was sufficient evidence for the jury to convict defendants for their false statements.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's judgment of acquittal on the wire fraud and wire fraud conspiracy counts, AFFIRM the district court's denial of a judgment of acquittal and a new trial on the false statement counts, and REMAND with directions for the entry of judgment consistent with the foregoing and for consideration of defendants' motion for a new trial on the wire fraud and wire fraud conspiracy counts.

---

[73] *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2012) ("[T]he task of choosing among permissible competing inferences is for the jury, not a reviewing court.").

[74] *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006).